UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>DAVID JOHN AKA DAVID JOHN FONDOTS,<br>    Defendant | CRIMINAL No. 19 CR-10357-RGS |

## UNITED STATES' SENTENCING MEMORANDUM

The United States submits this memorandum in support of its recommendation that Defendant David John aka David John Fondots (hereinafter, "Fondots" or "Defendant") be sentenced to 33 months incarceration, three years of supervised release, restitution to the victim of the wire fraud of $177,483, restitution as a condition of supervised release to the IRS of $187,603, forfeiture of $177,483, and a fine in the guideline range of $20,000 to $200,000.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 14, 2020, Fondots pleaded guilty, pursuant to a plea agreement, to an Information alleging one count of wire fraud in violation of 18 U.S.C. § 1343, and one count of filing a false tax return in violation of 26 U.S.C. §7206(1).

From October 2014 to April 2016, Fondots was the chief executive officer ("CEO") of Victim Company A, a Massachusetts start-up to sell streaming music services and ring tones for mobile phones.  Other investors and victims provided financing for the company.  Complaint Aff. (Exh. A, Dkt #1, #6 (redacted)), ¶ 8-10.  As Victim Company A's CEO, Fondots' responsibilities included raising investor funds and managing the company's finances.  He had sole access to and control over Victim Company A's accounting records and signature authority on all Victim Company A's bank accounts.  He was responsible for receiving invoices, paying bills, initiating wire transfers, and handling all financial aspects of the company.  Exh. A ¶ 10.

Fondots' family member (Family Member 1) was the president, director, treasurer, and secretary of a lingerie boutique located in Nantucket, Massachusetts.  Family Member 1 had sole signature authority over the lingerie company bank accounts.  *Id.* ¶ 11.

Between about July 2014 and April 2016, Fondots engaged in a scheme to defraud Victim Company A by misappropriating company funds for his personal benefit.  Specifically, Fondots transferred more than $205,000 of Victim Company A funds—in addition to his authorized compensation—directly to himself, Family Member 1, and to and on behalf of companies controlled by Family Member 1 the following ways:

(1)   $57,280 to bank accounts in the name of Family Member 1;

(2)   $21,000 to and on behalf of Family Member 1's lingerie business;

(3)   $50,875 for legal expenses unrelated to Victim Company A;

(4)   70,428 for staffing services ostensibly provided by a fictitious person;

(5)   $6,000 to Person B, who has no business relationship with Victim Company A.

Exh. A ¶ 17 and Exh. B (loss calculations spreadsheet).[1]  In addition, Fondots misappropriated Victim Company A funds by making additional payment for personal expenses of Fondots and his family, such as American Express bills, car payments, personal travel expenses and in cash withdrawals of more than $143,000.  *See* Exh. B.

### (1) $57,280 to Accounts of and on behalf of Family Member 1

From about July 1, 2014 to March 2, 2016, Fondots misappropriated approximately $57,280 by making payments to bank accounts controlled by Family Member 1 and payments on behalf of Family Member 1 as follows:

---

[1] The Exhibits hereto are being filed under seal to protect confidential information contained therein and the names of other individuals and victims named therein.

Between July 2014 and November 4, 2014, Fondots wrote four checks to Family Member 1 from a Victim Company A Bank of America account.  These payments, which had no business purpose related to Victim Company A, were deposited into Family Member 1's personal account at Middlesex Savings Bank ("MSB#6377").  Family Member 1 was the sole signatory on this account.  One of the checks reflected the memo "Loan to OF-NLI", a reference to Family Member 1's lingerie company.  Fondots concealed these payments by not recording these transactions in the accounting spreadsheets that he maintained and provided to others at Victim Company A.  Exh. A ¶ 19-20, Exh. J (Wire Fraud Loss Spreadsheet).

From June 29, 2015 to March 2, 2016, Fondots also caused Victim Company A's funds to be wired from Victim Company A Citibank accounts to Family Member 1's MSB#6377 account.  The total amount of these wires was approximately $45,000.  These wires had no business purpose for Victim Company A.  Fondots concealed some of these payments in Victim Company A's accounting records by making false entries to make it appear that they were payments to a legitimate vendor used by Victim Company A.  Exh. A ¶ 21-23, Exh. J.

On about June 29, 2015, Fondots also wired $6,879 from Citi #3836 to Curve Expo, an intimate apparel and swim trade show held on the east coast of the United States that has no business relationship with Victim Company A.  In order to conceal the recipient of the funds, Fondots made a false entry in Victim Company A's records to make it appear that these funds were wired to an actual vendor of Victim Company A.  Exh. A ¶ 21-23, Exh. J.

### (2) $21,000 in Payments to and on Behalf of Lingerie Business

On May 25, 2015, Fondots wrote a $21,000 check to Family Member 1's lingerie business from Victim Company A.  This check was deposited into a Citizens Bank account in the name of the lingerie business.  Fondots concealed the real beneficiary of this transfer by

making a false entry in Victim Company A's accounting records in the name of a legitimate

business with whom Victim Company A did business.  Exh. A ¶ 24-25, Exh. J.

### (3) $50,975 in Payments for Personal Legal Expenses

From about December 2014 through about March 2016, Fondots also transferred a total

of $50,875 of Victim Company A funds to pay for his and Family Member 1's personal legal

expenses for several legal matters unrelated to Victim Company A, as follows:

*Payments to Attorney 1 for Unrelated Civil Cases*

Between December 9, 2014 and April 24, 2015, Fondots used $20,381 of Victim

Company A funds to pay Attorney 1, an attorney who handled three civil cases and the voluntary

bankruptcy filing of another company controlled by Family Member 1.  Specifically, on

December 9, 2014, Fondots sent two checks totaling $19,897 from Victim Company A to an

account in the name of Terra Sourcing Group, a/k/a Terra Staffing or Terra Recruiting ("Terra").

Both checks were deposited together on December 12, 2014 into a Middlesex Savings Bank

account (MSB#8939) in Terra and Family Member 1's names.  Only Family Member 1 had

signatory authority over this account, which was used solely to receive funds from Victim

Company A and pay expenses of Fondots and Family Member 1 unrelated to Victim Company

A.  On December 16, 2014, a $20,000 check was issued from the MSB#8939 to Attorney 1.  If

not for the two checks from Victim Company A, the Terra check payable to Attorney 1 would

not have cleared and MSB#8939 would have been overdrawn.  Exh. A ¶¶ 26-29, Exh. J.

*Payments to Attorney 2 for Unrelated Civil Case*

Between April 6, 2015 and April 22, 2015, Fondots wrote three checks from Victim

Company A payable to Terra totaling $17,905 that were deposited into the Terra MSB#8939

account.  Thereafter, on or about April 22, 2015, Family Member 1 wired $13,312.50 from the

MSB#8939 account to the Law Office of Attorney 2 in Providence, Rhode Island.  Attorney 2 represented the plaintiff in a civil case filed against a company owned by Family Member 1.  If not for the three checks from Victim Company A, the wire payable to Attorney 2 would have not cleared causing MSB#8939 to be overdrawn.  Exh. A ¶¶ 30-31. Exh. J.

*Use of Victim Company A funds to pay for FONDOTS' criminal bail*

On about March 15 and 16, 2016, following his arrest on unrelated criminal charges for child pornography in Ohio (which were later dismissed), without authorization, Fondots used $12,589 of Victim Company A funds to pay his bail in Cleveland, Ohio.  Exh. A ¶¶32-33, Exh. J.

### (4) $70,428 to Terra/"Name G"

From December 2, 2014 to April 15, 2016, Fondots took approximately $70,428 from Victim Company A by making payments in the name of Terra that were deposited into accounts entitled "[Family Member 1] D/B/A Terra Sourcing Group" at Middlesex Savings Bank and "[Family Member 1 D/B/A Terra Sourcing Group" at Citizens Bank.  Family Member 1 has sole signature authority over both accounts.  Exh. A ¶ 34, Exh. J.

Fondots falsely represented to the founders and investors of Victim Company A that Name G ("Name G") was a real person providing administrative services for Victim Company A.  Fondots made approximately 22 payments from Victim Company A funds to Terra but no staffing or other services sufficient to support such payments were authorized for or performed by Terra.  Exh. A, ¶ 34-38, Exh. J, Exhs. F-H, N.  In fact, Name G was not a real person, but a fiction used by Fondots and Family Member 1 to divert funds from Victim Company A (and from Fondots' previous company).  The Connecticut address used for Terra was actually the address of another family member of Fondots.  There is no legitimate staffing company called Terra at that address.  Exh. A ¶¶ 34-38.  In fact, Fondots' own

counsel, in trying to avoid getting Family Member 1 added to a civil complaint, admitted to the state court that Name G is someone "whose identity was a fiction." Exh. C at 11. The counsel further admitted, "there is no [person by Name G]." *Id.* He did not state that it was a name for Family Member 1. *Id.* But in fact, the payments that purported to be made to Name G were made to Family Member 1. Exh. A ¶ 34-37, *Id.* Fondots also concealed the true recipient of a payment to Terra by making a false entry in Victim Company A's accounting records by listing it as a payment to a law firm in New York with which Victim Company A did business. Exh. A ¶ 38, Exh. J.

### (5) $6,000 to Person B (Related to Business of Family Member 1)

On about June 18 and July 28, 2015, Fondots misappropriated approximately $6,000 of Victim Company A funds by initiating two unauthorized wire transfers for $3,000 each to the bank account of Person B at Banco de Bogota Gustavo Eduardo Fontecha in Colombia. In or about August 2015, Person B's shipping company sent a package to a co-signee named "Victim Company A Holding Group – [the lingerie business]" at the address of the lingerie business in Nantucket, Massachusetts. Exh. A ¶ 39-40, Exh. J.

### (6) Other unauthorized transfers for benefit of Fondots and His Family

From December 2014 to April 2016, Fondots also misappropriated additional Victim Company A funds of approximately $143,337 to pay for various personal expenses by writing checks, sending wires and withdrawing cash. Exhs. B, F at 4, G at 2-3, H at 5-6, N at 2.

### (7) The False Tax Returns

For tax years 2014 through 2016, Fondots verified and caused to be filed with the IRS Form 1040 federal tax returns in which he did not report the income he embezzled from Victim Company A and much of the income that he received as compensation as follows.

| Calendar Tax Year | Approx. Filing Date | Unreported Income | Taxes Due and Owing |
|---|---|---|---|
| 2014 | 5/19/2016 | $157,316 | $38,289 |
| 2015 | 6/22/2016 | $437,878 | $126,015 |
| 2016 | 10/02/2018 | $163,809 | $23,299 |
| TOTAL | | $759,003 | $187,603 |

Exhs, D (calculation of taxes owed), E (unreported income), K-L (2014-2016 tax returns).

II.    GOVERNMENT'S POSITION ON THE GUIDELINES

The Government takes the position that Defendant's Guidelines are calculated as follows:

1.    **Wire Fraud (Count 1):**

   a.   Defendant's base offense level for the wire fraud count is 7, because the offense of conviction has a statutory maximum term of imprisonment of 20 years or more (USSG § 2B1.1(a)(1));

   b.   Defendant's offense level is increased by at least 10, because the loss was more than $150,000 (USSG § 2B1.1(b)(G));

   c.   Defendant's offense level is increased by 2, because the offense involved sophisticated means and Defendant intentionally engaged in or caused the conduct constituting sophisticated means (USSG § 2B1.1(b)(10)(C)); and

   d.   Defendant's offense level is increased by 2, because Defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense (USSG § 3B1.3).

2.    **Filing False Tax Returns (Count 2):**

   a.   Defendant's base offense level for filing false tax returns is 16, because the tax loss is more than $100,000 but not more than $250,000 (USSG §§ 2T1.4(a)(1), 2T4.1(F)); and

   b.   Defendant's offense level is increased by 2, because he failed to report income exceeding $10,000 in any one year from criminal activity (USSG § 2T1.4(b)(1)).

3.    **Grouping:**  The offense level applicable to Count 1 is increased by 2 because the offense level applicable to Count 2 is 1-4 levels less serious (USSG § 3D1.4(a)).

## ARGUMENT

I.    THE EVIDENCE BEFORE THE COURT ESTABLISHES THE EXTENT OF THE FRAUD AS SET FORTH IN THE INFORMATION AND FOUND IN THE PSR.

The evidence before this Court amply supports the wire fraud loss calculation of at least

$177,483. At sentencing, the enhancements need only be established by a preponderance of the

evidence. *United States v. Malouf*, 466 F.3d 21, 26 (1st Cir. 2006). Moreover, in sentencing, the

court can rely on a wide variety of evidence not ordinarily admissible in a criminal trial. As

explained by the First Circuit in *United States v. Rodriguez*, 336 F.3d 67, 71 (1st Cir. 2003):

> During the sentencing phase of a criminal case, the Federal Rules of Evidence do not apply and a defendant's Sixth Amendment right to confront the witness against him does not attach. In light of these principles, the sentencing court has broad discretion to accept hearsay evidence at sentencing so long as the court supportably concludes that the information has sufficient indicia of trustworthiness to warrant a finding of probable accuracy.

*Id.* (citations and internal quotations omitted). *See also United States v. Pinet-Fuentes*, 888 F.3d

557, 560 (1st Cir. 2018) (noting that the Court may consider hearsay and other evidence not

permitted under conventional jury trial rules).

The exhibits, affidavit, interview reports, admissions of Defendant and his counsel,

undisputed evidence of the transfers of funds, and victim statements may all be considered by the

Court in determining the sentence in this case. Thus, there is more than sufficient basis in the

evidence before this Court to make a reasonable estimate of the loss amounts and find the other

enhancements by a preponderance of the evidence and with probable accuracy.

### A. The Wire Fraud Loss Clearly Exceeds $150,000.

Defendant's offense level is increased by ten levels (at least) pursuant to USSG §

2B1.1(b)(1)(I) because the actual loss from his conduct exceeded $150,000. "[T]he Guidelines

[provide] clear instruction that a district court need not establish loss with precision, but rather,

may make a reasonable estimate of the loss, based on the available information." *United States*

*v. Cox*, 851 F.3d 113, 125-26 (1st Cir. 2017) (citing, *inter alia*, USSG § 2B1.1 app. n.3(C)).  The totality of the evidence more than sufficiently demonstrates that the loss caused by Defendant's wire fraud is reasonably estimated to be over $150,000.

First, Defendant's own admissions here make clear that he embezzled funds from the Victim Company.  That is the essence of his guilty plea.  Nor does he now dispute that he made make the transfers of funds at issue for his own benefit or that of Family Member 1.  Instead Defendant argues that he was entitled to secretly divert hundreds of thousands of dollars from his company as compensation to himself, even though (1) he had an agreement with the board to limit his compensation, (2) he did not report the funds he diverted to himself as income, and (3) he concealed the diversion through false entries in the books and records, false statement to the investors, and the use of a fictitious person.  Defendant's arguments are contrary to his own admissions, the undisputed records of the transfers, his duty as a CEO, and common sense.

In his statement of the offense, Defendant admits that his pay was reduced as part of a deal with investors and states that if not for this reduction, he would never have received more compensation than he was authorized or due and there would be no legal basis for charges in Count 1.[2]  He has thus acknowledged that because of this reduction in pay, there was a legal basis for the charged in Count 1 and that the funds he took in excess of that agreed-upon compensation were not authorized.  PSR ¶ 27, Exhs E, F, P. Q, R. I (documenting authorized, reported and actual compensation).  The documents summarized in Exhibit A and B, as well as the witness statements, establish that, in addition to his agreed upon salary, Fondots paid the

---

[2] Defendant also makes allegations against the investors in his former company and asserts that the civil suit was without merit and that he was threatened after the civil suit began. These allegations are simply not relevant to this sentencing and thus the United States will not address them at this time.

$57,280 to Family Member 1, $21,000 to Family Member 1's lingerie business, $50,875 for legal expenses unrelated to Victim Company A, $70,428 to Family Member 1 as payments to Terra staffing and Name G, and $6,000 to Person B, who does business with Family Member 1.

There is no legitimate basis for Defendant's use of the funds of Victim Company A to pay attorneys' fees for Family Member 1, or expenses for Family Member 1's business, or his own bail in the Ohio child pornography case.  Even if Defendant believed himself entitled to more compensation, it is still fraud to secretly divert the funds from the company disguised and reported as payments to legitimate vendors and not report the compensation he is taking in the books and records or tax filings as income to him.  The evidence also demonstrates that Defendant tried to conceal his diversion in the books and record of Victim Company A by making false entries to make it appear as if the payments went to legitimate vendors and corporate attorneys – vendors and attorneys who never received those funds.  Exhs. A ¶¶ 19, 22-25, 38, Exh. F at 2-3, Exh. G at 2-3, Exh. H at 1, 4-6, Exh. N at 2.  There is no credible explanation for Defendant falsifying in the books and records the recipient of these funds other than to hide his own embezzlement.

In addition, the admissions of Defendant's own attorney make clear that Name G was a fiction.  Exh. C at 11.  The bank records establish that the funds purportedly paid to Name G and Terra actually went to Family Member 1.  Neither Defendant nor Family Member 1 reported these amounts as income.  The victim statements confirm that there was no approval or knowledge that Fondots was diverting these funds to Family Member 1 and that no services supporting such charges were provided.  Exh. F at 3-4 (explaining payments to Terra were unjustified and Terra did not exist).  Exh. N.  All of this is clear evidence of the Defendant's

intent to conceal his embezzlement of these funds.  Thus, the preponderance of evidence demonstrates that the loss from the wire fraud scheme was at least the $177,483.[3]

Defendant also argues that he was entitled to compensation for health insurance and thus the certain amount that he paid for health insurance should not be included in the loss. Defendant, however, conflates wire fraud loss with tax loss.  In fact, however, the calculations of the wire fraud loss do not include the payments for health insurance (Chesapeake).  The health insurance payments are included in the calculation of unreported income in the tax fraud calculation because these payments, whether authorized or not, were not to a pre-tax employer established health insurance plan and thus were part of the unreported income to Defendant.

Defendant also argues that there is not a loss because he paid some amounts back to the victims in a civil settlement.  The Guidelines are clear, however, that amounts paid back after the fraud was discovered by a victim of the offense are not credited against loss under USSG § 2B1.1(E)(i).  The United States has already deducted in its loss calculation of $177,483 the $28,100 that Defendant paid to Mariposa prior to discovery of the fraud.  Exh. J.

**B.  The Tax Fraud Loss Exceeds $100,000 and Includes Relevant Years.**

Contrary to Defendant's claim, the Court must include all tax losses from the three years of false returns concealing his income from Victim Company A in the tax loss calculation under the Guidelines.  The Sentencing Guidelines and controlling case law make clear that tax loss for Guidelines purposes is not limited to the tax loss charged or in the count of conviction, but includes the tax losses resulting from the relevant pattern of conduct, which includes uncharged conduct that was part of the same scheme.  *See* USSG § 2T1.1 comment, (n.2) ("In determining

---

[3] In the plea agreement, the Government reserved the right to argue that the loss was more than $250,000.  The Government has limited its recommendation for the wire fraud loss here to the $177,483 that is readily apparent from records submitted to the Court and Probation.

the total tax loss attributable to the offense (see § 1B1.3(a)(2)), all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated.").  Application Note 2 to USSG § 2T1.1 also lists as examples of conduct such as occurred here that should be treated as part of the same course of conduct or common scheme or plan, including

> (A) there is a continuing pattern of violations of the tax laws by the defendant;
> (B) the defendant uses a consistent method to evade or camouflage income …;
> (C) the violations involve the same or a related series of transactions; and
> (D) the violation in each instance involves a failure to report or an understatement of a specific source of income e.g., … income from a particular business activity.

*Id.*

As explained in *United States v. Thomas*, 635 F.3d 13, 16-18 (1st Cir. 2011):  "When calculating the tax loss attributable to the offense, [the First Circuit] liberally construe[s] as 'relevant conduct' all conduct violating the tax laws ... unless the evidence demonstrates that the conduct is clearly unrelated."  U.S.S.G. § 2T1.1 cmt. n. 2."  *Id.*  In *Thomas*, the Court upheld as within relevant conduct tax evasion for the years 1995 and 1996, even though the defendant had pleaded guilty only to evasion of a tax assessment for the year 2001.  *Id.*

Relevant conduct thus includes all tax losses flowing from the pattern of conduct at issue here - the pattern of not reporting the funds Defendant embezzled and received as income from Victim Company A.  Thus, under USSG §§ 2T1.1 and 2T4.1, the base offense level is 16 because the loss for the three years period in which he did not report his income and the funds embezzled from Victim Company A were more than $100,000 but less than $250,000.

Fondots also argues that he did not intend to commit tax fraud because he was waiting for a 1099 from Mariposa or otherwise expecting to amend his returns later.  These arguments are irrelevant, make no sense, and are contrary to his guilty plea.  Fondots was the CEO of Victim

Company A and thus was responsible for issuing the appropriate tax documentation.  Moreover, when Fondots filed these returns (in May of 2016 for 2014, June of 2016 for tax year 2015 and October of 2018 for tax year 2016), he certainly knew about all of the income—both legitimate and embezzled—that he had received.  He signed returns that were false because they incorrectly excluded hundreds of thousands of dollars of income.  This is no mistake.  It is tax fraud.

### C.  Defendant Used Sophisticated Means.

Defendant also used sophisticated means in carrying out his embezzlement scheme and thus merits the application of a two-level sophisticated means adjustment under USSG §2B1.1(b)(10).   The Guidelines define sophisticated means as:

> especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. . . . Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

USSG § 2B1.1(b)(10)(C) & app. n.9(B).

Fondots, the CEO of Victim Company A, used the name of a fictitious person (Name G) and a sham company, Terra Staffing, as well as several of Family Member 1's companies, to divert funds from Victim Company A and conceal where the funds were really going – to himself and Family Member 1.  He transferred funds through accounts in other names and controlled by Family Member 1.  He disguised the embezzlement in the books and records of the company as payments to other legitimate vendors.  Such use of shell companies, fake names, and falsified business records are the hallmarks of sophisticated means.

### D.  Fondots Occupied a Position of Trust.

Fondots is also incorrect in denying that he occupied and used a position of trust in carrying out this embezzlement scheme.  As explained in application Note 1 to USSG § 3B.13, abuse of a position of trust refers to "a position of public or private trust characterized by

professional or managerial discretion." *Id.* It thus applies when a chief executive officer such as

Fondots, in a position of obvious managerial responsibility and discretion, uses his position and

control of the company's accounts and books and records to steal from his company and its

investors.[4]  Defendant's claim that he did not abuse a position of trust is thus contrary to the

plain meaning of the enhancement, the application notes, and case law.

### E.  Defendant's Denial of Criminal Culpability

Finally, although the United States included a reduction for acceptance of responsibility

when it submitted its statement of offense, as Probation has determined, PSR ¶ 44, Defendant

now appears to be denying his criminal liability by claiming that he lacked criminal intent, and

has additionally denied much of the conduct that was part of the fraudulent scheme and the tax

fraud.  In his submission to Probation, the Defendant stated, among other things, that he "was not

intending to take money without repaying or to cheat the government."  He further claimed there

was "no intent to commit any crime."  PSR ¶ 26.  These assertions are clearly contrary to his plea

to wire fraud and tax fraud and demonstrate that he has not in fact accepted responsibility for any

of his crimes.  Furthermore, he also claimed that "all alleged funds taken for himself were paid

back in full despite the legitimate nature of those transfers", asserting that all of the transfers

were legitimate and likewise inconsistent with his plea as well as the evidence before this Court.

---

[4] *See, e.g.*, *United States v. Reichel*, 911 F.3d 910 (8th Cir. 2018) (finding abuse of position of trust by president and CEO who used his position to defraud investors and divert funds to his personal benefit); *United States v. Plato*, 593 Fed. Appx. 364, (5th Cir. 2015) (holding that president and CEO who used his position to misallocate company funds warranted abuse of position of trust enhancement); *United States v. Pruett*, 681 F.3d 232, 248-49 n.10 (5th Cir. 2012) (upholding abuse of position of trust enhancement for president and CEO of company for environmental violations, noting "[w]e have found that a president and chief executive officer of a company occupies a position of trust for purposes of § 3B1.3.").

Even with respect to the tax counts, although Defendant filed tax returns reporting far less income than he had received and pleaded guilty to that, he now attempts to argue that he was waiting for further information to "get the math right." PSR ¶ 26. Not only is this inconsistent with his guilty plea, it is also inconsistent with the facts. Fondots filed false returns in 2016 and 2018 claiming not to have received income that he knew he had received. Far from attempting to report the income appropriately, he was hiding the transfer of funds that had already happened to himself and Family Member 1. Thus, with respect to the tax fraud as well, Defendant appears to be failing to accept responsibility for the crime to which he pleaded guilty. Pursuant to the plea agreement, "the government may object to any reduction in the Defendant's sentence based on acceptance of responsibility if (at) sentencing, Defendant does not clearly accept responsibility for the crimes he is pleading guilty to committing." Dkt. #26 at 3.

## II.     APPLICATION OF GUIDELINES AND SECTION 3553(a) FACTORS

The Guidelines "serve as the starting point for the district court's decision and anchor the court's discretion in selecting an appropriate sentence." *United States v. Molina-Martinez*, 136 S. Ct. 1338, 1349 (2016). Once the sentencing court has established the Guidelines Sentencing Range, it must then evaluate the sentencing factors set out in 18 U.S.C. § 3553(a). *United States v. Dixon*, 449 F.3d 194, 204 (1st Cir. 2006). The goal is to fashion "a sentence sufficient, but not greater than necessary," for the achievement of the legitimate objectives of sentencing. 18 U.S.C. § 3553(a); *Dixon*, 449 F.3d at 204.

### A.     Nature, Circumstances, and Seriousness of the Offenses

Defendant's crimes are serious and significant. He was a chief executive officer in charge of a start-up company. He held a position of trust to manage the investors' money with care and he abused that position and trust to steal from the company and lied to the investors

15

about it repeatedly. He also deliberately filed false tax returns to conceal this embezzled income as well as his regular compensation from Victim Company A from the IRS.

   B.   History and Characteristics of Defendant

Defendant appears to have been a wealthy business man who lived a comfortable life with a house in Andover and another in Nantucket. He had no need to commit fraud and take his investors' money. He simply chose to do so. He could afford to pay his taxes. He simply chose not to. He shows not an ounce of remorse for any of it. To the contrary, as discussed above, Defendant continues to deny his crimes and blame his victims. His continued refusal to acknowledge his conduct is another reason why he should receive a multi-year sentence in this case. Defendant engaged in a pattern of deceit and fraud, shows no acceptance of responsibility or remorse. His continued deceit about his conduct suggests that he is a real risk for repeating such conduct, should he have the opportunity.

   C.   Need to Promote Respect for the Law and Just Punishment

Defendant's abuse of his position to embezzle requires a significant sentence to send a clear message that such disregard for the law will bring serious consequences. The nature of start-up companies is that the investors must trust the company's leaders. The actions of a CEO in embezzling the company's funds not only cheats the company's investors, but also discourages other potential investors in the start-up economy.

Also, the criminal tax laws are designed to protect the integrity of the nation's tax system, which is dependent upon a system of voluntary compliance. It is vital that when a citizen is non-compliant, that citizen is appropriately punished and all understand that will include a term of incarceration. *See United States v. Zukerman,* 897 F.3d 423, 427 (2d Cir. 2018) (explaining that "'tax crimes represent an especially damaging category of criminal offenses,' which 'strike at the foundation of functioning government'") (citations omitted).

Failure to sentence Fondots, a wealthy executive who committed such brazen embezzlement and tax fraud to a significant term of incarceration would send the wrong message—the message "that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). It is important both to "the deterrence of white-collar crime (of central concern to Congress), and "the minimization of discrepancies between white- and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail." *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (cited and quoted with approval in *United States v. Levinson*, 543 F.3d 190, 197 (3d Cir. 2008) (noting that "probationary sentences for white-collar crime raise concerns of sentencing disparities according to socio-economic class.").[5] A serious multi-year term of incarceration is required to promote respect for the law and provide just punishment for this Defendant in this case.

D. Need to Afford Adequate Deterrence in White Collar and Tax Crimes in Particular

A significant sentence of imprisonment is also necessary to deter such conduct by others.

---

[5] *See also United States v. Sample*, 901 F.3d 1196, 1198-1201 (10th Cir. 2018) (vacating sentence for white-collar defendant sentenced to probation to allow him to work and repay victims as impermissibly sentencing based on the defendant's income); *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."); *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) ("[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."); *United States v. Stall*, 581 F.3d 276, 286 (6th Cir. 2009) ("We do not believe criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose."); *United States v. Ture*, 450 F.3d 352, 359 (8th Cir. 2006) (explaining that deciding against imprisonment because a defendant "owes a substantial amount of back taxes, interest, and penalties . . . is entirely improper and . . . results in bad public policy"); *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) ("Business criminals are not to be treated more leniently than members of the 'criminal class' just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity.").

It is critical that executives of such start-up companies understand that the consequences of stealing their investors' funds will be jail.  The Sentencing Guidelines also provide that deterrence should be the primary consideration in sentencings for tax crimes.  Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring other tax law violations is of particular importance when punishing criminal tax violations.  USSG § 2T1, introductory cmt. (2016).  Defendant's willful refusal to pay his fair share and continued denial of responsibility here demonstrate that a significant sentence to provide both specific and general deterrence is necessary.

Sentencing Fondots to a significant term of incarceration such as the Guidelines provide will convey the message to others that systematic and repeated efforts to defraud one's own investors and cheat on one's taxes will be met with strong punishment.  Such a sentence will make clear that the criminal law punishes equally those with privilege as it does those without.

E.  The Need to Avoid Unwarranted Sentence Disparities Among Defendants Guilty of Similar Conduct

The legislative history of the Sentencing Reform Act of 1984, which created the United States Sentencing Commission, made clear that one of the Act's goals was to rectify the serious problem in the criminal justice system that white-collar offenders were not being adequately punished.  *See* S. Rep. No. 98-225, at 77 (1983) ("[S]ome major offenders, particularly white-collar offenders . . . frequently do not receive sentences that reflect the seriousness of their offenses.").  Then-Judge Breyer, an original member of the Sentencing Commission, explained:

> The Commission found in its data significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft.  The Commission's statistics indicated that where white collar fraud was involved, courts granted probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation.  To mitigate the inequities of these discrepancies, the

18

> Commission decided to require short but certain terms of confinement for many white collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.

*See* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 20-21 (1988).  The need to avoid disparities between such crimes and the gulf between white-collar and non-white collar sentences calls for a serious sentence here where an executive deliberately flouted the law and cheated his fellow-taxpayers.

III.   **RESTITUTION CANNOT BE CAPPED OR AVOIDED BY THE CIVIL SETTLEMENT.**

Defendant is also incorrect that the order of restitution should be capped or reduced by the amount he paid in the civil settlement.  First, a release in a civil settlement agreement cannot cap restitution obligations.  To the contrary, the Mandatory Victim Restitution Act of 1996 ("MVRA") makes restitution mandatory for offenses against property in violation of Title 18 of the United States code.  18 U.S.C. § 3663A(c)(1)(A)(ii).  To effectuate its goal of making crime victims whole, the MVRA dictates that "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant."  18 U.S.C. § 3664(f)(1)(A).

Moreover, First Circuit authority makes clear that a civil settlement and release does not avoid the need for an appropriate restitution award.  As explained by the First Circuit in *United States v. Savoie*, 985 F.2d 612, 619 (1st Cir. 1993), in rejecting a claim that a civil settlement should limit criminal restitution:

> But, the sort of restitution imposed below is not a civil affair; it is a criminal penalty meant to have deterrent and rehabilitative effects.  Private parties cannot simply agree to waive the application of a criminal statute.  Because the law will not tolerate privately negotiated end runs around the criminal justice system, we reject appellant's claim that the district court could no longer order him to make restitution.  At the same time and for the same reason, we reject appellant's related claim that the settlement figure capped the amount of restitution that could be ordered.

*Id.* (citations omitted).  *See United States v. Parsons*, 141 F.3d 386, 393 (1st Cir. 1998) (ordering restitution despite civil settlement, noting "release by the victim does not preclude or cap restitution of losses as part of criminal sentencing in a case where there is no double recovery").

The MVRA does instruct that "[a]ny amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim" in federal or state civil proceedings.  18 U.S.C. § 3664(j)(2).  Restitution to compensate the victim for the $177,483 wire fraud loss is warranted over and above any amount paid in the civil settlement, which went entirely to the payment of attorney's fees, as stated in the victim's statement.  Exh. N.  Thus, a civil restitution award of at least the $177,483 in wire fraud loss is required under the MVRA.

## CONCLUSION

Defendant, a successful corporate executive and CEO, chose to use his position to siphon off corporate funds to himself and his family.  He also hid his income—authorized and embezzled—from the IRS in three years of tax returns.  The Government respectfully submits that a sentence of 41 months is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553.

<div style="margin-left:40%">

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:    /s/ Sara Miron Bloom
       SARA MIRON BLOOM
       Assistant United States Attorney
       (617) 748-3265

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) .

<u>   /s/ Sara Miron Bloom            </u>
SARA MIRON BLOOM

Date: October 19, 2020

# EXHIBITS A-R

# FILED UNDER SEAL