UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>DAVID JOHN AKA DAVID JOHN FONDOTS,<br>　　　Defendant | CRIMINAL No. 19 CR-10357-RGS |

## UNITED STATES' UPDATED SENTENCING MEMORANDUM

The United States submits this updated memorandum in support of its recommendation that Defendant David John aka David John Fondots (hereinafter, "Fondots" or "Defendant") be sentenced to 33 months incarceration, three years of supervised release, restitution to the victim of the wire fraud of $177,483, restitution as a condition of supervised release to the IRS of $187,603, forfeiture of $177,483, and a fine in the guideline range of $20,000 to $200,000. This memorandum is updated in light of the Defendant's new sentencing positions now that he is once again represented by counsel. The exhibits cited herein are the exhibits previously filed in support of the United States' original sentencing memorandum.

### FACTUAL AND PROCEDURAL BACKGROUND

On February 14, 2020, Fondots pleaded guilty, pursuant to a plea agreement, to an Information alleging one count of wire fraud in violation of 18 U.S.C. § 1343, and one count of filing a false tax return in violation of 26 U.S.C. §7206(1).

From October 2014 to April 2016, Fondots was the chief executive officer ("CEO") of Victim Company A, a Massachusetts start-up to sell streaming music services and ring tones for mobile phones. Other investors and victims provided financing for the company. Complaint Aff. (Exh. A, Dkt #1, #6 (redacted)), ¶ 8-10. As Victim Company A's CEO, Fondots' responsibilities included raising investor funds and managing the company's finances. He had

sole access to and control over Victim Company A's accounting records and signature authority on all Victim Company A's bank accounts. He was responsible for receiving invoices, paying bills, initiating wire transfers, and handling all financial aspects of the company. Exh. A ¶ 10.

Fondots' family member (Family Member 1) was the president, director, treasurer, and secretary of a lingerie boutique located in Nantucket, Massachusetts. Family Member 1 had sole signature authority over the lingerie company bank accounts. *Id.* ¶ 11.

Between about July 2014 and April 2016, Fondots engaged in a scheme to defraud Victim Company A by misappropriating company funds for his personal benefit. Specifically, Fondots transferred more than $205,000 of Victim Company A funds—in addition to his authorized compensation—directly to himself, Family Member 1, and to and on behalf of companies controlled by Family Member 1 the following ways:

(1)   $57,280 to bank accounts in the name of Family Member 1;

(2)   $21,000 to and on behalf of Family Member 1's lingerie business;

(3)   $50,875 for legal expenses unrelated to Victim Company A;

(4)   70,428 for staffing services ostensibly provided by a fictitious person;

(5)   $6,000 to Person B, who has no business relationship with Victim Company A.

Exh. A ¶ 17 and Exh. B (loss calculations spreadsheet).[1] In addition, Fondots misappropriated Victim Company A funds by making additional payment for personal expenses of Fondots and his family, such as American Express bills, car payments, personal travel expenses and in cash withdrawals of more than $143,000. *See* Exh. B.

---

[1] The Exhibits hereto are being filed under seal to protect confidential information contained therein and the names of other individuals and victims named therein.

### (1) $57,280 to Accounts of and on behalf of Family Member 1

From about July 1, 2014 to March 2, 2016, Fondots misappropriated approximately $57,280 by making payments to bank accounts controlled by Family Member 1 and payments on behalf of Family Member 1 as follows:

Between July 2014 and November 4, 2014, Fondots wrote four checks to Family Member 1 from a Victim Company A Bank of America account.  These payments, which had no business purpose related to Victim Company A, were deposited into Family Member 1's personal account at Middlesex Savings Bank ("MSB#6377").  Family Member 1 was the sole signatory on this account.  One of the checks reflected the memo "Loan to OF-NLI", a reference to Family Member 1's lingerie company.  Fondots concealed these payments by not recording these transactions in the accounting spreadsheets that he maintained and provided to others at Victim Company A.  Exh. A ¶ 19-20, Exh. J (Wire Fraud Loss Spreadsheet).

From June 29, 2015 to March 2, 2016, Fondots also caused Victim Company A's funds to be wired from Victim Company A Citibank accounts to Family Member 1's MSB#6377 account.  The total amount of these wires was approximately $45,000.  These wires had no business purpose for Victim Company A.  Fondots concealed some of these payments in Victim Company A's accounting records by making false entries to make it appear that they were payments to a legitimate vendor used by Victim Company A.  Exh. A ¶ 21-23, Exh. J.

On about June 29, 2015, Fondots also wired $6,879 from Citi #3836 to Curve Expo, an intimate apparel and swim trade show held on the east coast of the United States that has no business relationship with Victim Company A.  In order to conceal the recipient of the funds, Fondots made a false entry in Victim Company A's records to make it appear that these funds were wired to an actual vendor of Victim Company A.  Exh. A ¶ 21-23, Exh. J.

### (2) $21,000 in Payments to and on Behalf of Lingerie Business

On May 25, 2015, Fondots wrote a $21,000 check to Family Member 1's lingerie business from Victim Company A.  This check was deposited into a Citizens Bank account in the name of the lingerie business.  Fondots concealed the real beneficiary of this transfer by making a false entry in Victim Company A's accounting records in the name of a legitimate business with whom Victim Company A did business.  Exh. A ¶ 24-25, Exh. J.

### (3) $50,975 in Payments for Personal Legal Expenses

From about December 2014 through about March 2016, Fondots also transferred a total of $50,875 of Victim Company A funds to pay for his and Family Member 1's personal legal expenses for several legal matters unrelated to Victim Company A, as follows:

*Payments to Attorney 1 for Unrelated Civil Cases*

Between December 9, 2014 and April 24, 2015, Fondots used $20,381 of Victim Company A funds to pay Attorney 1, an attorney who handled three civil cases and the voluntary bankruptcy filing of another company controlled by Family Member 1.  Specifically, on December 9, 2014, Fondots sent two checks totaling $19,897 from Victim Company A to an account in the name of Terra Sourcing Group, a/k/a Terra Staffing or Terra Recruiting ("Terra").  Both checks were deposited together on December 12, 2014 into a Middlesex Savings Bank account (MSB#8939) in Terra and Family Member 1's names.  Only Family Member 1 had signatory authority over this account, which was used solely to receive funds from Victim Company A and pay expenses of Fondots and Family Member 1 unrelated to Victim Company A.  On December 16, 2014, a $20,000 check was issued from the MSB#8939 to Attorney 1.  If not for the two checks from Victim Company A, the Terra check payable to Attorney 1 would not have cleared and MSB#8939 would have been overdrawn.  Exh. A ¶¶ 26-29, Exh. J.

*Payments to Attorney 2 for Unrelated Civil Case*

Between April 6, 2015 and April 22, 2015, Fondots wrote three checks from Victim

Company A payable to Terra totaling $17,905 that were deposited into the Terra MSB#8939

account.  Thereafter, on or about April 22, 2015, Family Member 1 wired $13,312.50 from the

MSB#8939 account to the Law Office of Attorney 2 in Providence, Rhode Island.  Attorney 2

represented the plaintiff in a civil case filed against a company owned by Family Member 1.  If

not for the three checks from Victim Company A, the wire payable to Attorney 2 would have not

cleared causing MSB#8939 to be overdrawn.  Exh. A ¶¶ 30-31. Exh. J.

*Use of Victim Company A funds to pay for FONDOTS' criminal bail*

On about March 15 and 16, 2016, following his arrest on unrelated criminal charges for

child pornography in Ohio (which were later dismissed), without authorization, Fondots used

$12,589 of Victim Company A funds to pay his bail in Cleveland, Ohio.  Exh. A ¶¶32-33, Exh. J.

### (4) $70,428 to Terra/"Name G"

From December 2, 2014 to April 15, 2016, Fondots took approximately $70,428 from

Victim Company A by making payments in the name of Terra that were deposited into

accounts entitled "[Family Member 1] D/B/A Terra Sourcing Group" at Middlesex Savings

Bank and "[Family Member 1 D/B/A Terra Sourcing Group" at Citizens Bank.  Family

Member 1 has sole signature authority over both accounts.  Exh. A ¶ 34, Exh. J.

Fondots falsely represented to the founders and investors of Victim Company A that

Name G ("Name G") was a real person providing administrative services for Victim

Company A.  Fondots made approximately 22 payments from Victim Company A funds to

Terra but no staffing or other services sufficient to support such payments were authorized

for or performed by Terra.  Exh. A, ¶ 34-38, Exh. J, Exhs. F-H, N.  In fact, Name G was not a

real person, but a fiction used by Fondots and Family Member 1 to divert funds from Victim Company A (and from Fondots' previous company). The Connecticut address used for Terra was actually the address of another family member of Fondots. There is no legitimate staffing company called Terra at that address. Exh. A ¶¶ 34-38. In fact, Fondots' own counsel, in trying to avoid getting Family Member 1 added to a civil complaint, admitted to the state court that Name G is someone "whose identity was a fiction." Exh. C at 11. The counsel further admitted, "there is no [person by Name G]." *Id.* He did not state that it was a name for Family Member 1. *Id.* But in fact, the payments that purported to be made to Name G were made to Family Member 1. Exh. A ¶ 34-37, *Id.* Fondots also concealed the true recipient of a payment to Terra by making a false entry in Victim Company A's accounting records by listing it as a payment to a law firm in New York with which Victim Company A did business. Exh. A ¶ 38, Exh. J.

### (5) $6,000 to Person B (Related to Business of Family Member 1)

On about June 18 and July 28, 2015, Fondots misappropriated approximately $6,000 of Victim Company A funds by initiating two unauthorized wire transfers for $3,000 each to the bank account of Person B at Banco de Bogota Gustavo Eduardo Fontecha in Colombia. In or about August 2015, Person B's shipping company sent a package to a co-signee named "Victim Company A Holding Group – [the lingerie business]" at the address of the lingerie business in Nantucket, Massachusetts. Exh. A ¶ 39-40, Exh. J.

### (6) Other unauthorized transfers for benefit of Fondots and His Family

From December 2014 to April 2016, Fondots also misappropriated additional Victim Company A funds of approximately $143,337 to pay for various personal expenses by writing checks, sending wires and withdrawing cash. Exhs. B, F at 4, G at 2-3, H at 5-6, N at 2.

### (7) The False Tax Returns

For tax years 2014 through 2016, Fondots verified and caused to be filed with the IRS

Form 1040 federal tax returns in which he did not report the income he embezzled from Victim

Company A and much of the income that he received as compensation as follows.

| Calendar Tax Year | Approx. Filing Date | Unreported Income | Taxes Due and Owing |
|---|---|---|---|
| 2014 | 5/19/2016 | $157,316 | $38,289 |
| 2015 | 6/22/2016 | $437,878 | $126,015 |
| 2016 | 10/02/2018 | $163,809 | $23,299 |
| TOTAL | | $759,003 | $187,603 |

Exhs. D (calculation of taxes owed), E (unreported income), K-L (2014-2016 tax returns).

II.     THE PARTIES' POSITION ON THE GUIDELINES

The parties agree that the Defendant's offense level is 20 (33-41 months), which is

calculated as follows:

**1.     Wire Fraud (Count 1):**

   a.   Defendant's base offense level for the wire fraud count is 7, because the offense of conviction has a statutory maximum term of imprisonment of 20 years or more (USSG § 2B1.1(a)(1));

   b.   Defendant's offense level is increased by at least 10, because the loss was more than $150,000 (USSG § 2B1.1(b)(G));

   c.   Defendant's offense level is increased by 2, because the offense involved sophisticated means and Defendant intentionally engaged in or caused the conduct constituting sophisticated means (USSG § 2B1.1(b)(10)(C)); and

   d.   Defendant's offense level is increased by 2, because Defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense (USSG § 3B1.3).

2. **Filing False Tax Returns (Count 2):**

    a. Defendant's base offense level for filing false tax returns is 16, because the tax loss is more than $100,000 but not more than $250,000 (USSG §§ 2T1.4(a)(1), 2T4.1(F)); and

    b. Defendant's offense level is increased by 2, because he failed to report income exceeding $10,000 in any one year from criminal activity (USSG § 2T1.4(b)(1)).

3. **Grouping:** The offense level applicable to Count 1 is increased by 2 because the offense level applicable to Count 2 is 1-4 levels less serious (USSG § 3D1.4(a)).

4. **Acceptance of Responsibility**: Defendant's combined offense level is decreased by 3, because Defendant has accepted responsibility for Defendant's crimes (USSG §3E1.1).

## ARGUMENT

I.    THE EVIDENCE BEFORE THE COURT ESTABLISHES THE FRAUD AND ENHANCEMENTS AS SET FORTH IN THE PLEA AGREEMENT AND THE PSR.

**A. The Wire Fraud Loss Clearly Exceeds $150,000.**

Defendant's offense level is increased by ten levels (at least) pursuant to USSG § 2B1.1(b)(1)(I) because the actual loss from his conduct exceeded $150,000.  "[T]he Guidelines [provide] clear instruction that a district court need not establish loss with precision, but rather, may make a reasonable estimate of the loss, based on the available information." *United States v. Cox*, 851 F.3d 113, 125-26 (1st Cir. 2017) (citing, *inter alia*, USSG § 2B1.1 app. n.3(C)).  The totality of the evidence more than sufficiently demonstrates that the loss caused by Defendant's wire fraud is reasonably estimated to be over $150,000.

The evidence before this Court amply supports the wire fraud loss calculation of at least $177,483, which the Defendant apparently no longer disputes.  Defendant's own admissions here make clear that he deliberately and over a period of several years embezzled funds from the Victim Company.   Defendant secretly diverted hundreds of thousands of dollars from his

company as compensation to himself, even though (1) he had an agreement with the board to limit his compensation, (2) he did not report the funds he diverted to himself as income, and (3) he concealed the diversion through false entries in the books and records, false statement to the investors, and the use of a fictitious person.

The documents summarized in Exhibit A and B, as well as the witness statements, establish that, in addition to his agreed upon salary, Fondots paid the $57,280 to Family Member 1, $21,000 to Family Member 1's lingerie business, $50,875 for legal expenses unrelated to Victim Company A, $70,428 to Family Member 1 as payments to Terra staffing and Name G, and $6,000 to Person B, who does business with Family Member 1.

There is no legitimate basis for Defendant's use of the funds of Victim Company A to pay attorneys' fees for Family Member 1, or expenses for Family Member 1's business, or his own bail in the Ohio child pornography case. The evidence also demonstrates that Defendant tried to conceal his diversion in the books and record of Victim Company A by making false entries to make it appear as if the payments went to legitimate vendors and corporate attorneys – vendors and attorneys who never received those funds. Exhs. A ¶¶ 19, 22-25, 38, Exh. F at 2-3, Exh. G at 2-3, Exh. H at 1, 4-6, Exh. N at 2.

In addition, the admissions of Defendant's own attorney make clear that Name G was a fiction. Exh. C at 11. The bank records establish that the funds purportedly paid to Name G and Terra actually went to Family Member 1. Neither Defendant nor Family Member 1 reported these amounts as income. The victim statements confirm that there was no approval or knowledge that Fondots was diverting these funds to Family Member 1 and that no services supporting such charges were provided. Exh. F at 3-4 (explaining payments to Terra were unjustified and Terra did not exist). Exh. N. All of this is clear evidence of the Defendant's

intent to conceal his embezzlement of these funds.  Thus, the preponderance of evidence demonstrates that the loss from the wire fraud scheme was at least the $177,483.[2]

**B.  The Tax Fraud Loss Exceeds $100,000 and Includes Relevant Years.**

All tax losses from the three years of false returns concealing his income from Victim Company A are part of the tax loss calculation under the Guidelines.  The Sentencing Guidelines and controlling case law make clear that tax loss for Guidelines purposes includes the tax losses resulting from the relevant pattern of conduct, which includes uncharged conduct that was part of the same scheme.  *See* USSG § 2T1.1 comment, (n.2) ("In determining the total tax loss attributable to the offense (see § 1B1.3(a)(2)), all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated.").

Relevant conduct thus includes all tax losses flowing from the pattern of conduct at issue here - the pattern of not reporting the funds Defendant embezzled and received as income from Victim Company A.  Thus, under USSG §§ 2T1.1 and 2T4.1, the base offense level is 16 because the loss for the three years period in which he did not report his income and the funds embezzled from Victim Company A were more than $100,000 but less than $250,000.

**C.  Defendant Used Sophisticated Means.**

 Defendant also used sophisticated means in carrying out his embezzlement scheme and thus merits the application of a two-level sophisticated means adjustment under USSG §2B1.1(b)(10).   The Guidelines define sophisticated means as:

> especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. . . . Conduct such as hiding assets or

---

[2] In the plea agreement, the Government reserved the right to argue that the loss was more than $250,000.  The Government has limited its recommendation for the wire fraud loss here to the $177,483 that is readily apparent from records submitted to the Court and Probation.

transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

USSG § 2B1.1(b)(10)(C) & app. n.9(B).

Fondots, the CEO of Victim Company A, used the name of a fictitious person (Name G) and a sham company, Terra Staffing, as well as several of Family Member 1's companies, to divert funds from Victim Company A and conceal where the funds were really going – to himself and Family Member 1. He transferred funds through accounts in other names and controlled by Family Member 1. He disguised the embezzlement in the books and records of the company as payments to other legitimate vendors. Such use of shell companies, fake names, and falsified business records are the hallmarks of sophisticated means.

**D. Fondots Occupied a Position of Trust.**

Fondots occupied and used a position of trust in carrying out this embezzlement scheme. As explained in application Note 1 to USSG § 3B.13, abuse of a position of trust refers to "a position of public or private trust characterized by professional or managerial discretion." *Id.* It thus applies when a chief executive officer such as Fondots, in a position of obvious managerial responsibility and discretion, uses his position and control of the company's accounts and books and records to steal from his company and its investors. *See, e.g.*, *United States v. Reichel*, 911 F.3d 910 (8th Cir. 2018) (finding abuse of position of trust by president and CEO who used his position to defraud investors and divert funds to his personal benefit); *United States v. Plato*, 593 Fed. Appx. 364, (5th Cir. 2015) (holding that president and CEO who used his position to misallocate company funds warranted abuse of position of trust enhancement); *United States v. Pruett*, 681 F.3d 232, 248-49 n.10 (5th Cir. 2012) (upholding abuse of position of trust enhancement for president and CEO of company for environmental violations, noting "[w]e have

11

found that a president and chief executive officer of a company occupies a position of trust for purposes of § 3B1.3.").

II.     APPLICATION OF GUIDELINES AND SECTION 3553(a) FACTORS

The Guidelines "serve as the starting point for the district court's decision and anchor the court's discretion in selecting an appropriate sentence." *United States v. Molina-Martinez*, 136 S. Ct. 1338, 1349 (2016). Once the sentencing court has established the Guidelines Sentencing Range, it must then evaluate the sentencing factors set out in 18 U.S.C. § 3553(a). *United States v. Dixon*, 449 F.3d 194, 204 (1st Cir. 2006). The goal is to fashion "a sentence sufficient, but not greater than necessary," for the achievement of the legitimate objectives of sentencing. 18 U.S.C. § 3553(a); *Dixon*, 449 F.3d at 204.

A.    Nature, Circumstances, and Seriousness of the Offenses

Defendant's crimes are serious and significant. He was a chief executive officer in charge of a start-up company. He held a position of trust to manage the investors' money with care and he abused that position and trust to steal from the company and lied to the investors about it repeatedly for years. He also deliberately filed false tax returns to conceal this embezzled income as well as his regular compensation from Victim Company A from the IRS. These are serious crimes that each merit a significant jail sentence. The combined pattern of behavior over many years certainly merits such a sentence.

B.    History and Characteristics of Defendant

Defendant appears to have been a wealthy businessman who lived a comfortable life with a house in Andover and another in Nantucket. He had no need to commit fraud and take his investors' money. He simply chose to do so. He could afford to pay his taxes. He simply chose not to.

In addition, for years, the Defendant continued to deny his crimes and blame his victims. The victim statements submitted in this case amply demonstrate the extensive pattern of abusive conduct towards them in which the Defendant continued to engage for many years. For example, the victims noted, among many other things: "At no point, did he express any contrition or remorse for his actions, but deliberately taunted and, at times, threatened [Company A] shareholders . . . " Exh. N.

    C.  <u>Need to Promote Respect for the Law and Just Punishment</u>

Defendant's abuse of his position to embezzle requires a significant sentence to send a clear message that such disregard for the law will bring serious consequences. The nature of start-up companies is that the investors must trust the company's leaders. A start-up has few structures in place to protect its shareholders from the malfeasance of its executives. The actions of a CEO in embezzling the company's funds not only cheats that company's investors, but it also discourages other potential investors in start-up companies more generally.

Also, the criminal tax laws are designed to protect the integrity of the nation's tax system, which is dependent upon a system of voluntary compliance. It is vital that when a citizen is non-compliant, that citizen is appropriately punished, and all understand that will include a term of incarceration. *See United States v. Zukerman,* 897 F.3d 423, 427 (2d Cir. 2018) (explaining that "'tax crimes represent an especially damaging category of criminal offenses,' which 'strike at the foundation of functioning government'") (citations omitted). When a privileged CEO simply chooses to pay himself and not report the income, jail time is warranted. No other message will adequately deter others who are in such a position to help themselves by cheating both their shareholders and the taxpayers in general.

Failure to sentence Fondots, a wealthy executive who committed such brazen embezzlement and tax fraud to a significant term of incarceration would send the wrong

message—the message "that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006).  It is important both to "the deterrence of white-collar crime (of central concern to Congress), and "the minimization of discrepancies between white- and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail." *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (cited and quoted with approval in *United States v. Levinson*, 543 F.3d 190, 197 (3d Cir. 2008) (noting that "probationary sentences for white-collar crime raise concerns of sentencing disparities according to socio-economic class.").  Nor is a claim that a defendant can earn money to pay restitution an appropriate basis to avoid jail time.  Allowing actual or purpoted ability to earn money for restitution permit white collar defendants to avoid jail time would only result in a two systems of justice – one for those with means and opportunity to avoid jail, and jail time only for those without such means and purported job prospects.  *See United States v. Sample*, 901 F.3d 1196, 1198-1201 (10th Cir. 2018) (vacating sentence for white-collar defendant sentenced to probation to allow him to work and repay victims as impermissibly sentencing based on the defendant's income); *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."); *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) ("[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."); *United States v. Stall*, 581 F.3d 276, 286 (6th Cir. 2009) ("We do not believe criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose."); *United States v. Ture*, 450 F.3d 352, 359 (8th Cir. 2006)

14

(explaining that deciding against imprisonment because a defendant "owes a substantial amount of back taxes, interest, and penalties . . . is entirely improper and . . . results in bad public policy"); *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) ("Business criminals are not to be treated more leniently than members of the 'criminal class' just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity."). A serious multi-year term of incarceration is required to promote respect for the law and provide fair punishment for this Defendant in this case.

D. <u>Need to Afford Adequate Deterrence in White Collar and Tax Crimes in Particular</u>

A significant sentence of imprisonment is also necessary to deter such conduct by others. It is critical that executives of such start-up companies understand that the consequences of stealing their investors' funds will be jail.  The Sentencing Guidelines also provide that deterrence should be the primary consideration in sentencings for tax crimes.  Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring other tax law violations is of particular importance when punishing criminal tax violations.  USSG § 2T1, introductory cmt. (2016).

Sentencing Fondots to a significant term of incarceration such as the Guidelines provide will convey the message to others that systematic and repeated efforts to defraud one's own investors and cheat on one's taxes will be met with strong punishment.  Such a sentence will also make clear that the criminal law punishes equally those with privilege as it does those without.

E. <u>The Need to Avoid Unwarranted Sentence Disparities Among Defendants Guilty of Similar Conduct</u>

The legislative history of the Sentencing Reform Act of 1984, which created the United States Sentencing Commission, made clear that one of the Act's goals was to rectify the serious

problem in the criminal justice system that white-collar offenders were not being adequately

punished. *See* S. Rep. No. 98-225, at 77 (1983) ("[S]ome major offenders, particularly white-

collar offenders . . . frequently do not receive sentences that reflect the seriousness of their

offenses."). Then-Judge Breyer, an original member of the Sentencing Commission, explained:

> The Commission found in its data significant discrepancies between pre-
> Guideline punishment of certain white-collar crimes, such as fraud, and other
> similar common law crimes, such as theft. The Commission's statistics indicated
> that where white collar fraud was involved, courts granted probation to offenders
> more frequently than in situations involving analogous common law crimes;
> furthermore, prison terms were less severe for white-collar criminals who did not
> receive probation. To mitigate the inequities of these discrepancies, the
> Commission decided to require short but certain terms of confinement for many
> white collar offenders, including tax, insider trading, and antitrust offenders, who
> previously would have likely received only probation.

*See* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which*

*They Rest*, 17 Hofstra L. Rev. 1, 20-21 (1988). The need to avoid disparities between such

crimes and the gulf between white-collar and non-white collar sentences calls for a serious

sentence here where an executive deliberately flouted the law and cheated his fellow-taxpayers.

In considering the issue of unwarranted disparities in sentences, the Court should

consider the need to avoid sentencing disparities between this crime and other crimes motivated

by the desire to obtain money –not just disparities between this tax fraud and other frauds, but

also disparities between this crime and drug crimes, for instance. The need to avoid disparities

between such crimes and the gulf between white collar sentences and non-white collar sentences

calls strongly for a serious sentence here where an affluent businessman and CEO chose for

many years to deliberately flout the law and cheat his fellow-taxpayers. This court and others

have repeatedly held that embezzlement cases by persons in a position of even far less privilege

have appropriately warranted significant jail time. *See, e.g. United States v. Howland*, 21-CR-

10002-DJC (eighteen months incarceration for bookkeeper who embezzled $598,241 and did not

report embezzled funds to IRS); *United States v. DaSilva,* 12-CR-10375-RGS (27 months incarceration for bank teller who embezzled approximately $375,000); *United States v. Shannon*, 08-CR-10051-RGS (a year and a day incarceration for lower level bank employee who embezzled approximately $197,530).

Also, this Court and others in this district have repeatedly sentenced those who commit only the tax crimes alone to jail time. *See, e.g.*, *United States v. Haddad*, 20-CR-40024-TSH (eight months incarceration for tax fraud with restitution of $292,231); *United States v. Robert Joyce*, 20-CR-10049-NMG (six months incarceration for tax fraud alone with tax loss of approximately $330,000); *United States v. Robert Fuller*, 20-CR-40002-TSH (six months incarceration for tax fraud alone with tax loss of approximately $450,000); *United States v. Ngunjiri*, 19-CR-40034-TSH (six months incarceration for tax evasion with restitution of $406,407); *United States v. Richard Rogers,* 18-CR-40026-TSH (six months incarceration for chiropractor who concealed his income with restitution of $155,164); *United States v. Harry Richard*, 18-CR-10073-NMG) (1 year and 1 day of incarceration for roofing business owner with restitution of $353,246); *United States v. Robert Joyce*,  20-CR-10049-NMG (six months incarceration for payroll tax fraud with tax loss of approximately $330,000); *United States v. George Fenzel*, 14-CR-40005-TSH (sixteen months incarceration for dentist who concealed his income after downward departure due to cooperation, restitution of  $157,407); *United States v. Yanakopulos*, 17-CR-10401-RGS (D. Mass July 25, 2018) (1 year and 1 day incarceration for payroll tax fraud by restaurant owner with loss of $172,000); *United States v. Carey*, 16-CR-10354-ADB (18 months incarceration for accountant who failed to report income with tax loss of $355,535).

A multi-year sentence is thus necessary here both to appropriately punish this defendant, to deter others, particularly executives in small and start-up companies. The requested sentence is thus consistent with sentences for other similar embezzlement and tax offenders and an appropriate, reasonable sentence for the serious and multi-year fraud and tax crimes by this CEO.

III.    RESTITUTION CANNOT BE CAPPED OR AVOIDED BY THE CIVIL
        SETTLEMENT.

Defendant has also incorrectly suggested that the order of restitution should be capped or reduced by the amount he paid in the civil settlement. First, a release in a civil settlement agreement cannot cap restitution obligations. To the contrary, the Mandatory Victim Restitution Act of 1996 ("MVRA") makes restitution mandatory for offenses against property in violation of Title 18 of the United States code. 18 U.S.C. § 3663A(c)(1)(A)(ii). To effectuate its goal of making crime victims whole, the MVRA dictates that "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A).

Moreover, First Circuit authority makes clear that a civil settlement and release does not avoid the need for an appropriate restitution award. As explained by the First Circuit in *United States v. Savoie*, 985 F.2d 612, 619 (1st Cir. 1993), in rejecting a claim that a civil settlement should limit criminal restitution:

> But, the sort of restitution imposed below is not a civil affair; it is a criminal penalty meant to have deterrent and rehabilitative effects. Private parties cannot simply agree to waive the application of a criminal statute. Because the law will not tolerate privately negotiated end runs around the criminal justice system, we reject appellant's claim that the district court could no longer order him to make restitution. At the same time and for the same reason, we reject appellant's related claim that the settlement figure capped the amount of restitution that could be ordered.

*Id.* (citations omitted).  *See United States v. Parsons*, 141 F.3d 386, 393 (1st Cir. 1998) (ordering restitution despite civil settlement, noting "release by the victim does not preclude or cap restitution of losses as part of criminal sentencing in a case where there is no double recovery").

The MVRA does instruct that "[a]ny amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim" in federal or state civil proceedings.  18 U.S.C. § 3664(j)(2).  Restitution to compensate the victim for the $177,483 wire fraud loss is warranted over and above any amount paid in the civil settlement, which went entirely to the payment of attorney's fees, as stated in the victim's statement.  Exh. N. Thus, a civil restitution award of at least the $177,483 in wire fraud loss is required under the MVRA.

## CONCLUSION

Defendant, a successful corporate executive and CEO, chose to use his position to siphon off corporate funds to himself and his family.  He also hid his income—authorized and embezzled—from the IRS in three years of tax returns.  The Government respectfully submits that a significant sentence of incarceration is necessary here to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553.

Respectfully submitted,

NATHANIEL R. MENDELL
United States Attorney

By:   /s/ Sara Miron Bloom
SARA MIRON BLOOM
Assistant United States Attorney
(617) 748-3265

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) .

___/s/ Sara Miron Bloom_____

SARA MIRON BLOOM

Date: June 16, 2021

# EXHIBITS A-R

# FILED UNDER SEAL